Barbara NITKE, the National Coalition for Sexual Freedom, and the National Coalition for Sexual Freedom Foundation, Plaintiffs,

v.

John ASHCROFT, Attorney General of the United States of America, and the United States of America, Defendants.

No. 01 CIV. 11476(RMB).

United States District Court, S.D. New York.

March 24, 2003.

John Wirenius, Leeds, Morelli & Brown, P.C., Carle Place, NY, for plaintiffs.

Andrew W. Schilling, Assistant United States Attorney, New York City (James B. Comey, United States Attorney, of counsel), for defendants.

John H. Weston, Clyde DeWitt, Lawrence G. Walters, Weston, Garrou & DeWitt, Los Angeles, CA and Altamonte Springs, FL, Alan M. Abramson, Schuman Abramson Morak & Wolk, New York City, for amicus curiae First Amendment Lawyers Association.

ROBERT D. SACK, Circuit Judge, RICHARD M. BERMAN and GERARD E. LYNCH, District Judges.

### OPINION AND ORDER

PER CURIAM.

Plaintiffs Barbara Nitke, the National Coalition for Sexual Freedom ("Coalition"), and the National Coalition for Sexual Freedom Foundation ("Foundation") bring this action to enjoin enforcement of the obscenity provisions of the Communications Decency Act ("CDA"), Section 502 of the Telecommunications Act of 1996, 47 U.S.C. § 223(a)(1)(B). Pursuant to Section 561 of that Act, *id.* § 223 note, and 28 U.S.C. § 2284, a three-judge district court has been empaneled to hear the case.

Plaintiffs have moved for a preliminary injunction against enforcement of the CDA, and the Government moves to dismiss. For the reasons stated below, plain-

tiffs' motion will be denied, and the Government's motion will be granted in part, and denied in part.

## BACKGROUND

### I. The Parties

The plaintiffs operate a variety of websites that discuss issues "involving sexual freedom for consenting adults," and display images of adults engaged in nontraditional sexual practices, such as sadomasochism and fetishism. (Compl.¶ 2.) All three plaintiffs allege that they have omitted material from their websites, or have delayed the construction of those sites, for fear that they will be prosecuted under the obscenity provisions of the CDA.

Plaintiff Barbara Nitke is a photographer and member of the faculty of the School of Visual Arts in New York City, whose works have been published, displayed in galleries, and sold to private collectors. (*Id.* ¶ 1.) Her photographs depict adults engaged in a variety of sexual practices, and range from explicit close-ups of oral intercourse to portraits of nude and partially clothed subjects. Nitke states that her photographs "seek to capture the dynamic between the partners ... their affection and their intimacy and not just the acts they perform." (Nitke Dec. ¶ 4.) She has put a selection of her photographs on her website, www.barbaranitke.com, along with text explaining her artistic goals and the circumstances in which some of the photos were taken. (Compl.¶ 1.)

The National Coalition for Sexual Freedom is a nonprofit corporation that acts as a national advocacy group on behalf of individuals who practice "alternative sexual expression," such as consensual dominance and submission. (Wright Dec. ¶ 3.)

The Coalition is made up of organizations devoted to educating the public about nontraditional sexual practices, and protecting the rights of their individual members to engage in such practices. (Compl.¶ 2.) These members maintain websites, most of which are noncommercial, that contain erotic material, and provide free access to web surfers in order to "encourage artistic expression concerning sexual topics." (*Id.* ¶ 21.)

One member of the Coalition is The Eulenspiegel Society ("TES"), an organization composed of individuals who practice sadomasochism. TES operates a website that serves both its members and people who wish to learn about dominance and bondage practices, offering information about TES's meetings and subscriptions to its journal, *Prometheus*. (Hechtman Dec. ¶¶ 1–2.) Plaintiffs allege that TES has avoided posting any erotic fiction or images, including photographs taken by Barbara Nitke, on its website since the passage of the CDA. (*Id.* ¶ 2.)

The third plaintiff, the National Coalition for Sexual Freedom Foundation, is an entity distinct from the Coalition. Like the Coalition, it is "a nonprofit ... corporation organized under the laws of the District of Columbia" (Compl.¶ 3), whose member organizations serve individuals who practice alternative sexual expression.[1] The Foundation's goals include pursuing expanded rights for practitioners of nontraditional sex through litigation, education, and charity. (*Id.*) Like the Coalition, the Foundation alleges that its members operate noncommercial websites containing sexual content. (*Id.* ¶ 22.)

### II. The Internet

As plaintiffs note, the Internet is a global network of interconnected private and

---

**1.** It is unclear from the record whether TES is a member of the Foundation as well as of the Coalition.

public computers, on which individuals and other entities can post information and communicate with each other. (*Id.* ¶¶ 10–19.) One of the most popular aspects of the Internet is the World Wide Web (the "Web"), through which content providers can create and maintain websites that offer information, images, and links to other sites. It is relatively easy for individuals and other content providers to acquire the necessary server space to set up their own websites, or to transmit information in other ways. (*Id.* ¶ 14.)

It remains far more difficult, however, for website operators to limit access to their sites to adults, and to control the dissemination of information placed on the Web. (*Id.* ¶ 15.) There is currently no method by which a website proprietor can verify the age of a visitor before allowing that visitor to view the site, although it is possible to condition access on verification of credit card information. (*Id.* ¶ 17.) Plaintiffs allege that relying on credit card verification may be prohibitively expensive for nonprofit websites, however, and possession of a credit card is an imperfect proxy for adulthood. (*Id.*) In addition, websites are viewable in any place that has an Internet connection; it is currently impossible for website operators to make their sites accessible from some communities but not others. While a website can request information as to a visitor's physical location before allowing her to access the site, there is no way to verify that the information is correct. (*Id.* ¶¶ 15, 26.)

### III. *The Communications Decency Act of 1996*

Passed in 1996 as part of the Telecommunications Act, the CDA was designed to prevent minors from having access to obscene and explicit materials available on the Internet. As originally written, the CDA prohibited the use of telecommunications devices to transmit "any comment, ... image, or other communication which is obscene or indecent, knowing that the recipient of the communication is under 18 years of age." 47 U.S.C. § 223(a)(1)(B). In *Reno v. American Civil Liberties Union*, 521 U.S. 844, 882–85, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), however, the Supreme Court invalidated that portion of the statute which proscribed the transmission of indecent communications, and effectively severed the word "indecent" from the above-quoted language.

Section 223(a)(1)(B) now prohibits only obscene transmissions to minors by means of a telecommunications device, incorporating the tripartite definition of obscenity established by the Supreme Court in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). (Defs. Mem. at 17; Pls. Mem. at 13.) Thus, it is a crime to knowingly transmit to minors material that (1) the average person, applying contemporary community standards, would find appeals to the prurient interest; (2) is a patently offensive depiction of certain sex acts defined by applicable state law; and (3) lacks serious artistic, literary, political, or scientific value. *Miller*, 413 U.S. at 24, 93 S.Ct. 2607. The potential penalties faced by a defendant convicted of violating § 223(a)(1)(B) include up to two years' imprisonment and a fine. 47 U.S.C. § 223(a).

The statute's coverage is narrowed by two affirmative defenses. The first protects those who have taken "good faith, reasonable, effective, and appropriate" measures to restrict or prevent access by minors to an obscene communication, *id.* § 223(e)(5)(A), and the second covers those who have restricted minors' access by requiring verification of a credit card, debit account, adult access code, or adult personal identification number, *id.* § 223(e)(5)(B).

## DISCUSSION

### I. *The Parties' Contentions*

#### A. *The Plaintiffs' Complaint and Motion for a Preliminary Injunction*

■ The plaintiffs assert in their Complaint that § 223(a)(1)(B) is facially overbroad and unconstitutionally vague because its use of the *Miller* test to define obscenity necessitates that Internet content providers all over the country tailor their materials to the standards of the most restrictive locality. (Compl.¶¶ 37–40.) The *Miller* test mandates that jurors use local community standards in determining whether or not given material is obscene; thus, plaintiffs argue, material that is adjudged obscene in a conservative state or locality might not be considered obscene in an area with more liberal standards. (Pls. Mem. at 17–18.) Because content providers could potentially be prosecuted in any district in which the material has been viewed or received by minors (*id.* at 16 (quoting the federal venue statute, 18 U.S.C. § 3237(a))), and the nature of the Internet is such that websites are accessible from anywhere in the country, plaintiffs allege that they fear prosecution in districts that have more restrictive community standards than the ones in which they are based, even though their materials would not be considered obscene in their home communities. (*Id.* at 17; Compl. ¶ 37.) In effect, the CDA's use of community standards allegedly causes it to prohibit a substantial amount of non-obscene speech as well as obscenity,

and chills the speech of those individuals who wish to display on their websites material that would not be obscene in all localities. (Compl.¶¶ 38–40.) The plaintiffs seek a declaratory judgment that § 223(a)(1)(B) is facially overbroad, and therefore unconstitutional.[2] (*Id.* ¶ (1).)

The plaintiffs also assert that the CDA is unconstitutionally vague because it does not define the community whose standard will be used to judge potentially obscene material, and thus "reasonable speakers are unable to determine what community's standard of decorum they must comply with." (*Id.* ¶ 41.) The statute's vagueness, they allege, has chilled their exercise of their right to display non-obscene material (*id.* ¶ 42), and they seek a declaratory judgment that the CDA is void for vagueness.

Plaintiffs now move for a preliminary injunction enjoining the government from "commencing or continuing any action enforcing" § 223(a)(1)(B) (Pls. Mot. at 1), on the grounds that the CDA's alleged chill of their First Amendment rights is causing them irreparable injury, and that they have established a clear likelihood that they will succeed on the merits of their challenge to the constitutionality of the CDA. (Pls. Mem. at 3–5.)

#### B. *Defendant's Motion to Dismiss*

The Government opposes plaintiffs' motion for a preliminary injunction, arguing that plaintiffs have failed to show the ir-

---

**2.** The Government suggests that plaintiffs are challenging Congress's authority to regulate obscene speech on the Internet, in effect arguing that "distributing obscenity over the internet should be treated differently from all other means of distributing obscenity." (Defs. Mem. at 2.) Plaintiffs do not allege that Congress cannot criminalize the knowing distribution over the Internet of obscene materials to minors, however, but that the CDA's reliance on the *Miller* definition of obscenity,

which was developed in the context of traditional methods of distributing obscenity, renders the statute both overbroad and vague. (Pls. Mem. at 22–24.) Indeed, plaintiffs note the existence of other "viable" ways to define online obscenity that take into account the special characteristics of the Internet, suggesting that if the CDA used one of these methods, it might be constitutional. (Compl. ¶ 28; Pls. Mem. at 23.)

reparable harm necessary for preliminary relief. The CDA was passed in 1996, almost six years before plaintiffs instituted this lawsuit (Defs. Reply at 3), and the Government asserts that the delay in taking legal action indicates that plaintiffs will not suffer irreparable harm if the Government is not immediately enjoined from enforcing the CDA.

The Government also moves to dismiss the suit in its entirety. With respect to both the overbreadth and vagueness theories, the Government argues that Supreme Court precedent forecloses any challenge to an obscenity statute based on the uncertainty involved in determining under which community's standard a potential defendant may be prosecuted. (Defs. Mem. at 13–15, 18–19.) In addition, the Government argues that plaintiffs can prove no set of facts that would establish that the CDA is substantially overbroad, as the material that is potentially obscene in restrictive communities, but not obscene in more liberal ones, is "de minimis," and "the Constitution clearly permits ... de minimis impact on protected, yet utterly valueless, pornographic speech in the legitimate interest of deterring unlawful obscenity." (*Id.* at 24.)

## II. *Plaintiffs' Standing to Challenge the CDA*

As an initial matter, the Government argues that the plaintiffs have not alleged that they actually have been chilled from transmitting over the Internet the materials that would potentially be subject to different community standards in different localities (Defs. Mem. at 6), raising the issue of whether the plaintiffs have standing to challenge the CDA. The doctrine of standing is grounded in Article III's requirement that the federal courts adjudicate only actual cases or controversies, U.S. Const. art. III, § 2, cl. 1, and requires that a plaintiff, in order to establish that the Court has jurisdiction over her

case, allege that she has suffered "personal injury [that is] fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Thus, plaintiffs must allege that they have suffered "an injury in fact; that is ... some threatened or actual injury resulting from the putatively illegal action." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (internal quotation marks and citations omitted).

In the First Amendment context, a plaintiff's injury in fact often derives from the chilling effect caused by the allegedly unconstitutional statute. Because a chilled plaintiff's injury arises not from actual harm that has already occurred, but from the plaintiff's fear of future prosecution, the Court must ascertain that that fear is sufficiently concrete and immediate to constitute a present injury to plaintiff's First Amendment rights, rather than a speculative or illusory allegation of future harm. "[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm ...." *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Thus, plaintiffs must "proffer some objective evidence to substantiate [their] claim that the challenged conduct has deterred [them] from engaging in protected activity." *Bordell v. General Electric Co.*, 922 F.2d 1057, 1061 (2d Cir.1991).

### A. *Barbara Nitke*

Plaintiff Barbara Nitke has alleged that she is an "art photographer" specializing in photographs depicting adults engaged in alternative sexual practices, particularly sadomasochistic activities. (Compl.¶ 1.) While Nitke now maintains a

website that displays selected photographs, she states that she delayed setting up her website until 2001, because she was concerned that she would be prosecuted for displaying some of her photographs. (Nitke Reply Dec. ¶¶ 2–3.) Having constructed her website, she was "unsure what content it could safely contain," and consulted with counsel in order to "limit the chance that [she] could be prosecuted." (*Id.* ¶ 5.) Nitke's website now displays explicit photographs depicting, among other things, oral and genital intercourse, as well as various sadomasochistic activities. *See* www.barbaranitke.com (last visited March 20, 2003).

▮ Nitke's allegation of subjective chill is insufficient to establish standing, in light of the materials that she has placed on her website. While she states that she delayed constructing her website for three years because of her fear of prosecution, her eventual construction of the site indicates that whatever fear she may have had, it was not enough, in the end, to prevent her from displaying her photographs. In addition, some of the photographs on Nitke's website are potentially included within the *Miller* definition of obscenity, as they depict "ultimate sex acts, normal or perverted, actual or simulated." *Miller*, 413 U.S. at 25, 93 S.Ct. 2607. Despite the fact that this material might be found by juries in some jurisdictions to lack serious artistic value, and might be considered patently offensive and appealing to the prurient interest in some communities, thus exposing Nitke to prosecution under the CDA, she has nonetheless chosen to exhibit the photographs on her website. This evidence contravenes her contention that her speech has been chilled. The essence of a claim of chill is an assertion that one has elected to refrain from speaking, rather than risk prosecution; Nitke, on the other hand, has chosen to speak, stating that she is "taking the risk of prosecution." (Nitke Reply Dec.

¶ 6.) *See Bordell*, 922 F.2d at 1061 (noting that evidence that plaintiff had chosen to speak despite alleged potential for punishment belied his assertion that his speech had been chilled).

▮ Because Nitke has not presented objective evidence that her speech has been chilled, the complaint must be dismissed as to her. *Id.* Nitke has not alleged that she would prefer to display more explicit photographs, or photographs depicting practices that are less mainstream than those currently displayed, but has refrained from doing so because of her fear of prosecution under the CDA. Such an allegation would assert that Nitke has experienced actual chill, and that she has been deterred in the exercise of her First Amendment rights. Thus, Nitke will be given leave to replead within thirty days of the date of this Opinion and Order.

### B. *The Coalition*

▮ The Coalition does not allege chill on its own behalf, but states that its member organizations have been deterred from displaying material that they otherwise would place on their websites. (*Id.* ¶ 30.) As a voluntary member association, the Coalition can establish that it has standing to sue on behalf of its member organizations if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Because the Coalition has alleged that one of its members, The Eulenspiegel Society, has suffered actual chill as a result of the CDA, and satisfies the other requirements of associational standing, the Coalition has

standing to challenge the constitutionality of the CDA on behalf of its members.

TES would have standing to sue on its own behalf because it has proffered objective evidence that it has been deterred from exercising its First Amendment rights. *Bordell,* 922 F.2d at 1060–61. Dov Hechtman, TES's webmaster, states that "[i]t has been TES's policy and my policy of the last 6 years to avoid posting of fiction or images, or any even arguably erotic materials since August 1996." (Hechtman Dec. ¶ 2.) Because of TES's uncertainty as to which community standard might be used in a potential prosecution, it has "limited [its] use of protected speech." (*Id.* ¶ 3.) In addition, the Coalition itself states that TES has refrained from posting photographs taken by Barbara Nitke on its site because of concerns about prosecution. (Wright Reply Dec. ¶ 8.) This is evidence not merely of "subjective chill," *Laird,* 408 U.S. at 13–14, 92 S.Ct. 2318, but of the fact that TES's speech was actually deterred during the six years that the CDA has been in effect. Thus, TES, in contrast to Nitke, has established that it not only fears prosecution, but that that fear has caused it to curtail its exercise of its First Amendment rights.

The Coalition has also established the other prerequisites to associational standing. First, the interests that the Coalition seeks to protect through this lawsuit are germane to its purposes. *Hunt,* 432 U.S. at 344–45, 97 S.Ct. 2434. One of the Coalition's missions is to "promot[e] discussion concerning issues involving sexual freedom among consenting adults" (Compl. ¶ 2); seeking to enjoin the enforcement of a statute that is allegedly inhibiting its members' speech is central to that goal. Second, the Coalition's claims do not require individualized proof on the part of each of its members. *Hunt,* 432 U.S. at 344, 97 S.Ct. 2434. The Coalition asserts that the CDA is facially unconstitutional, so the

outcome will not depend on proof of individual applications of the statute. In addition, if the Coalition obtains the injunctive relief sought, the remedy will "inure to the benefit of those members … actually injured." *Id.* at 343, 97 S.Ct. 2434. Thus, the Coalition has standing to challenge the constitutionality of the CDA on behalf of its members.

### C. The Foundation

 The Foundation has not alleged sufficient facts to establish standing to sue, either on its own behalf, or on behalf of its members. Like the Coalition, the Foundation states that it is a nonprofit corporation that aims to promote public understanding and tolerance of people who practice alternative sexual activities, that its member organizations maintain websites with erotic content, and that they have limited their online speech. (Compl. ¶¶ 3, 22; Wright Reply Dec. ¶ 8.) The Foundation does not assert that its own speech has been deterred, or that it fears prosecution based on the materials on its website. (Wright Reply Dec. ¶¶ 7–8.) Thus, it has not alleged that it has suffered an injury in fact sufficient to give it standing on its own behalf.

 With respect to associational standing, the Foundation has alleged that one or more of its members has limited its speech in reaction to the CDA (Compl. ¶ 30; Wright Reply Dec. ¶ 8), but it has not provided any evidence, in the form of declarations from those members or other objective evidence, of specific instances of actual chill. *Bordell,* 922 F.2d at 1061 (requiring objective evidence in addition to allegations of chill). It is unclear whether the Foundation's membership includes TES, whose assertions as to the inhibition of its speech would be sufficient to confer associational standing on the Foundation, because plaintiffs have not explained in

their Complaint or attached declarations the nature of the relationship between the Foundation and the Coalition, and whether their memberships overlap. *Compare* Wright Reply Dec. ¶ 2 (treating the Foundation and the Coalition as one entity), *with* Hechtman Dec. ¶ 1 (stating that TES is a member of the Coalition, but not mentioning the Foundation). The Foundation also has not proffered evidence that any other member has limited its speech. Therefore, the Complaint must be dismissed as to the Foundation, with leave to replead within thirty days.

### III. *The Government's Motion to Dismiss*

#### A. *Legal Standard*

In the context of a motion to dismiss the Court accepts "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699–700 (2d Cir.1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998) (internal quotation marks and citation omitted). Thus, the Court may grant the Government's motion only if there is no set of facts that, if proven, would render the CDA unconstitutionally overbroad or vague because of its reliance on community standards.

#### B. *Obscenity Law*

##### 1. *Congressional Authority to Regulate Obscenity*

Obscenity is unprotected speech, and may be completely banned from the Internet or any other medium. *Am. Civil Liberties Union v. Reno*, 929 F.Supp. 824, 865 (E.D.Pa.1996), *aff'd*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). As the Supreme Court noted in *Roth v. United States*, 354 U.S. 476, 485,

77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the fact that obscenity "is not within the area of constitutionally protected speech or press" allows the federal government and the states free rein to regulate obscenity, without a showing that the material is harmful or that the state has a compelling interest in regulating. Thus, congressional authority to ban or otherwise regulate obscenity does not vary with the medium at issue, and the Supreme Court has upheld federal laws that prohibit the distribution of obscenity by mail, *United States v. Reidel*, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971), by common carrier, *United States v. Orito*, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973), and by telephone, *Sable Communications of Calif., Inc. v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), as well as the importation of obscene material, *United States v. Thirty–Seven (37) Photographs*, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822(1971).

While the government has plenary power to regulate obscenity, it does not have the authority to restrict the dissemination of non-obscene material in the process of regulating obscenity, or to draft obscenity statutes that have the effect of prohibiting or inhibiting speech that is not obscene. The Supreme Court has consistently struck down statutes that, by their terms, prohibited only obscenity, but used methods that chilled an excessive amount of explicit but non-obscene speech. Thus, in *Smith v. California*, 361 U.S. 147, 152, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), the Court invalidated a state statute that imposed strict liability on booksellers who sold obscene materials, stating that "our holding in *Roth* does not recognize any state power to restrict the dissemination of books which are not obscene; and we think this ordinance's strict liability feature would tend seriously to have that

effect." Obscenity statutes such as that in *Smith* have the effect of "restrict[ing] the public's access to forms of the printed word which the State [may] not constitutionally suppress directly," and may be unconstitutionally overbroad.[3] *Jacobellis v. Ohio*, 378 U.S. 184, 194, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (plurality opinion) (citing *Smith v. California*, 361 U.S. at 154, 80 S.Ct. 215) (internal quotation marks omitted). Thus, while Congress has the authority to ban or regulate obscenity, these statutes must be narrowly drawn so as not to reach non-obscene speech.

### 2. *The Miller Test*

Thus, the method by which an obscenity statute distinguishes between obscenity and non-obscene speech can determine whether it is overbroad, or whether it is drawn with sufficient precision to withstand constitutional scrutiny. In *Miller v. California*, the Supreme Court set forth the three-part test that delineates between obscenity and protected speech, stating:

> The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. at 24, 93 S.Ct. 2607 (internal quotation marks and citations omitted). Federal statutes, including the CDA, incorporate this definition of obscenity in order to separate unprotected obscenity from protected speech.

The first and second prongs of the test establish the universe of sexual material that is sufficiently hard core and explicit to be potentially obscene. The first prong requires that the material as a whole appeal to the prurient interest, or the "shameful or morbid interest in ... sex," *Roth*, 354 U.S. at 487 n. 20, 77 S.Ct. 1304 (internal citations omitted), when considered by the "average person, applying contemporary community standards." *Miller*, 413 U.S. at 24, 93 S.Ct. 2607. The second prong requires that the material depict a form of sexual conduct that is defined by state law, and also that the material be patently offensive according to

---

**3.** The Government argues that *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989), establishes that "federal obscenity statutes are not rendered unconstitutional merely because of the potential chilling effect on materials that are sexually explicit, but not obscene," and that therefore, as long as a statute purports to prohibit only "obscenity," any incidental restriction of non-obscene material is constitutional. (Defs. Mem. at 20.) *Fort Wayne Books* involved a different issue from *Smith*, however, as there the plaintiffs argued not that the statute effectively criminalized the dissemination of non-obscene material as well as obscenity, but that the severity of the potential penalties for distributing obscenity would induce them to limit their distribution of indecent but non-obscene materials. *Fort Wayne Books*, 489 U.S. at 59, 109 S.Ct. 916. The Court rejected

this argument, holding that all criminal obscenity statutes, in the process of legitimately deterring the sale of obscenity, would inevitably cause prudent booksellers to err on the side of caution in deciding which of their books not to sell because they might be potentially obscene, and that this chilling effect, because it arose from the variable nature of the obscenity definition and the inherent gravity of criminal penalties, would not render a statute unconstitutional. *Id.* at 59–60, 109 S.Ct. 916. Thus, *Fort Wayne Books* did not involve a statute with which people would be unable to comply without severely limiting their own speech, as was the case in *Smith*, and does not contradict *Smith's* holding that a statute that on its face prohibits obscenity may nonetheless be unconstitutional if its provisions potentially prohibit an excessive amount of non-obscene speech.

contemporary community standards. *Smith v. United States*, 431 U.S. 291, 301, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) (indicating that the community standards test should be used to judge patent offensiveness). Thus, the tests used to determine whether material is sufficiently sexual and offensive to constitute obscenity are explicitly linked to the geography of the prosecution.

The primary purpose of the community standards test is to ensure that jurors view the material from the perspective of an average person, rather than from that of the most sensitive or susceptible member of the community. *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 122 S.Ct. 1700, 1708, 152 L.Ed.2d 771 (2002) (plurality opinion); *Roth*, 354 U.S. at 488–89, 77 S.Ct. 1304. The Supreme Court has indicated that courts may define the relevant community for the jury, or may allow the jury to draw its own conclusions as to the extent and nature of the community. *Hamling v. United States*, 418 U.S. 87, 104–06, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Areas as large as the state of California have been held to be acceptable communities, *Miller*, 413 U.S. at 30–31, 93 S.Ct. 2607, as have communities based on the city in which the obscenity was sold, *Hamling*, 418 U.S. at 109–10, 94 S.Ct. 2887. Despite this geographical indeterminacy, the community standard is nonetheless tied to the locality of the offense and the prosecution: jurors are to "draw on [their] own knowledge of the views of the average person in the community or vicinage from which [they] come[ ]," *id.* at 104, 94 S.Ct. 2887, and the Court has indicated that the community is not intended to encompass several states or the nation as a whole. *Miller*, 413 U.S. at 32, 93 S.Ct. 2607.

The community standard serves another purpose within the *Miller* test, to protect the rights of states and their communities to define obscenity for themselves. The " 'community' approach may well result in material being proscribed as obscene in one community but not in another ... [b]ut communities throughout the Nation are in fact diverse," and so the community standards test seeks to "reconcil[e] conflicting rights of the diverse communities within our society and of individuals."[4] *Jacobellis*, 378 U.S. at 200–01, 84 S.Ct. 1676 (Warren, C.J., dissenting); *see also Miller*, 413 U.S. at 32, 93 S.Ct. 2607. Thus, in order to protect communities' prerogative to define their own standards of obscenity, the test contemplates that the material encompassed within the definition of obscenity will vary from place to place.

The third prong of the *Miller* test, that the material must lack serious artistic, literary, political, or scientific value, is the only one not judged by community standards. *Reno*, 521 U.S. at 873, 117 S.Ct. 2329. It therefore counterbalances the inclusiveness of the first two prongs: "This 'societal value' requirement ... allows appellate courts to impose some limitations and regularity on the definition by setting, as a matter of law, a national floor for socially redeeming value." *Id.* To some extent, then, the societal value prong offsets the potential, inherent in the geographic dependency of the first two prongs, for a large amount of material to be considered obscene in some states, but not others.

---

4. While *Jacobellis* was decided before the third prong, with its objective test of societal value, had been added to the obscenity test, the Court quoted Chief Justice Warren's observations with approval in *Miller*, after it had reformulated the test to include the societal value prong. *Miller*, 413 U.S. at 32, 93 S.Ct. 2607. Thus, the Chief Justice's views continue to hold true with respect to the *Miller* obscenity test.

The protectiveness of the societal value prong should not be overstated, however, for two reasons. First, the test excludes from the definition of obscenity only that material which has "serious" societal value, a retreat from an earlier version of the obscenity test, which required that material be "utterly" without societal value before it could be declared obscene.[5] *Miller*, 413 U.S. at 21–22, 93 S.Ct. 2607; *Memoirs v. Massachusetts*, 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). Material with serious value is that which is "genuinely serious," *Miller*, 413 U.S. at 23, 93 S.Ct. 2607, and making this determination might entail judging the sincerity of the artistic or political intent, or the predominance of the artistic over the prurient intent. *Id.* at 25 n. 7, 93 S.Ct. 2607 ("A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication . . . ." (internal quotation marks and citations omitted)). Whatever the precise meaning of "serious" value, it is clear that the determination of value requires resolving issues of fact, and leaves ample room for both jurors and appellate judges to express their opinions as to the merits of the material.

Second, and more important, the societal value test does not completely offset the geographic variance caused by the first two prongs, and was not designed to do so. Having established the obscenity test in *Miller*, including the societal value prong, Chief Justice Burger defended the inclusion of the community standard in the test by asserting: "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City. People in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity." *Miller*, 413 U.S. at 32, 93 S.Ct. 2607. This statement assumes that Maine may prohibit some material that would not be obscene in New York—but any such material must not have serious value, which would protect it from being prohibited anywhere. Even though the third prong sets a "national floor" of societal value, *Reno*, 521 U.S. at 873, 117 S.Ct. 2329, the Court did not intend that it would exclude from the definition of obscenity all material that might be patently offensive and prurient in some areas, but not others. Thus, even with the societal value prong, the *Miller* test contemplates that the definition of obscenity will vary from state to state, or community to community. *Cf. Ashcroft*, 122 S.Ct. at 1710 (plurality opinion) (arguing that the societal value prong significantly limits the sweep of an obscenity statute).

 Consequently, material that is adjudged obscene in one locality might not be obscene in another. Even material that is not protected by the societal value prong cannot be held to be obscene in a particular community unless it also appeals to the prurient interest and depicts patently offensive conduct according to that community's local standards. *See Jenkins v. Georgia*, 418 U.S. 153, 160–61, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (holding that the film "Carnal Knowledge" could not be adjudged obscene, because it did not depict patently offensive sexual conduct). Thus, a pornographer may have a First Amendment right to distribute her materials to New York, where they are not considered obscene, but be subject to prosecution for the same materials in Maine. *See Jacobellis*, 378 U.S. at 194, 84 S.Ct. 1676 (plurality opinion) (recognizing this conse-

---

**5.** The Government argues that this prong still excludes only material that is "utterly lack-ing" in societal value (Defs. Mem. at 24), but this is clearly a misstatement of current law.

quence of the community standards test); *id.* at 200–01, 84 S.Ct. 1676 (Warren, C.J., dissenting).

### 3. *The Application of the Miller Test to the Internet*

The geographic variance in the amount of material included within the definition of obscenity creates a dilemma for Internet content providers who wish to disseminate explicit material, but want to avoid an obscenity prosecution. While the community standards test was developed at a time when obscenity prosecutions were primarily local, *see Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 58, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), and distributors chose the localities in which they mailed or displayed their material, online distribution is by definition nationwide. (Compl.¶ 15.) Thus, an Internet content provider who is relatively certain that her materials are not obscene in New York may nonetheless have to consider the possibility of a prosecution in Maine, since there is currently no technological means of limiting the geographic distribution of materials on the Internet. *Ashcroft*, 122 S.Ct. at 1708.

The problem created by the potential for varying community standards being used to prosecute material that has been distributed nationwide is "not a novel one," however. *Shea v. Reno*, 930 F.Supp. 916, 936 (S.D.N.Y.1996), *aff'd*, 521 U.S. 1113, 117 S.Ct. 2501, 138 L.Ed.2d 1006 (1997). The Supreme Court first examined the constitutionality of the use of the community standards test in federal statutes in *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), and revisited the issue in *Sable Communications of Calif., Inc. v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). In *Hamling*, the Court upheld a federal mail statute's use of the community standard, reasoning that since a pornographer already could be prosecuted according to the community standards of each state to which she chose to send her material, the existence of the federal statute and its incorporation of varying community standards would not materially alter a pornographer's risk calculus, and would not place an additional burden on her speech. *Hamling*, 418 U.S. at 106, 94 S.Ct. 2887. Fifteen years later, the Court applied similar logic to a federal ban on obscene interstate telephone communications, stating that "dial-a-porn" operators were "free to tailor [their] messages ... to the communities [they] choose[ ] to serve ... [They] ultimately bear[ ] the burden of complying with the prohibition on obscene messages." *Sable*, 492 U.S. at 125–26, 109 S.Ct. 2829. Thus, even though it might cost more for dial-a-porn operators to limit the geographic distribution of their messages, *id.* at 125, 109 S.Ct. 2829, the fact that this alternative was not prohibitively expensive meant that the operators could simply tailor their distribution rather than choosing not to speak.

■ The foundation of both the *Hamling* and *Sable* decisions is the premise that federal obscenity statutes do not sweep in protected speech because pornographers can control the distribution of their materials. *See id.; Hamling*, 418 U.S. at 106, 94 S.Ct. 2887. Thus, if a pornographer has the right to distribute sexually oriented materials to New York and Nevada because they are not obscene there, but might be subject to prosecution in Maine and Georgia for the same materials, she simply refrains from distributing those materials to Maine and Georgia. While she has no right to display or sell the materials in those more conservative states, her rights in the more liberal states are not affected, and so the federal statute's use of the community standard has not resulted in the restriction of protected speech. The "burden" involved, *Sable*, 492 U.S. at 126, 109 S.Ct. 2829, is simply that

of shouldering the costs of tailoring distribution in order to comply with the statute, a burden that is clearly constitutional in the contexts of this and other criminal statutes that prohibit activities that, while unprotected, have a proximate relationship to protected speech. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705–06, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (holding that because the state public indecency statute targeted unprotected conduct, incidental burden on speech inherent in complying with the law was constitutional). Thus, *Hamling* and *Sable* stand for the proposition that, where statutes target only unprotected speech or conduct, the First Amendment provides no absolute right to violate those statutes in search of the least expensive means of speaking.

■ In contrast, Internet obscenity statutes may have the effect of prohibiting protected speech, and thus are not comparable to the statutes at issue in *Hamling* and *Sable*. These statutes, like their more traditional predecessors, prohibit only "any communication which is obscene," 47 U.S.C. § 223(a)(1)(B), but because Internet content providers cannot control the geographic distribution of their materials, Internet obscenity statutes restrict protected speech. *See. e.g., Ashcroft*, 122 S.Ct. at 1714 (O'Connor, J., concurring) (recognizing this effect of Internet obscenity statutes). With no way to distribute online materials to New York but not to Maine, content providers, in the process of ensuring that they are complying with an Internet statute by tailoring their materials to Maine's community standards, have no choice but to refrain from distributing *anywhere* those materials that are obscene in Maine but not in New York. Thus, the burden involved in complying with statutes like the CDA is that of curtailing one's speech, a direct burden on First Amendment rights, rather than the incidental one involved in tailoring distribution to avoid more restrictive areas. Internet obscenity

statutes are therefore more analogous in their effect to the unconstitutional state statute at issue in *Smith v. California*, 361 U.S. at 152, 80 S.Ct. 215, which forced booksellers to drastically curtail their protected speech in the process of complying with its prohibition of obscenity, than they are to federal statutes regulating traditional obscenity. Where a statute restricts protected speech in the process of prohibiting unprotected speech, it is potentially overbroad, and therefore potentially unconstitutional. *Id.* at 153–54, 80 S.Ct. 215; *Arcara*, 478 U.S. at 706 n. 3, 106 S.Ct. 3172 ("[W]e have previously struck down generally applicable statutes that purport to regulate nonspeech ... if they unduly penalize speech, political or otherwise." (internal alterations, quotation marks and citations omitted)).

Five Justices recognized the potential sweep of Internet obscenity statutes in *Ashcroft v. ACLU*, stating that the Hamling–Sable rationale should not bar an overbreadth challenge to Internet obscenity statutes based on the community standards test. *Ashcroft*, 122 S.Ct. at 1714 (O'Connor, J., concurring); *id.* at 1718–19 (Kennedy, J., concurring, joined by Souter and Ginsburg, JJ.); *id.* at 1724 (Stevens, J., dissenting). Thus, Justice Kennedy wrote that *Hamling* and *Sable* were of "limited utility" in analyzing Internet statutes, because of the differences in the media involved. *Id.* at 1718–19. Justice O'Connor went further, stating that the application of *Hamling* and *Sable* to the Internet would "potentially suppress an inordinate amount of expression." *Id.* at 1714. While the three Justices who formed the plurality did state that *Sable*'s holding that the burden of complying with obscenity statutes should rest on content providers applied with equal force to the Internet, *id.* at 1710–13, a majority of the Court would have held that *Hamling* and *Sable* should not be applied to the Internet

without first examining the amount of protected speech that Internet statutes might suppress. Thus, contrary to the Government's argument (Defs. Mem. at 14; Defs. Reply Mem. at 13 n. 8), the Supreme Court has not definitively held that the reasoning of *Hamling* and *Sable* should apply to Internet statutes. *See Lurie v. Wittner*, 228 F.3d 113, 130 (2d Cir.2000) (determining that the reasoning of a plurality opinion did not constitute the holding of the Supreme Court because a majority had not subscribed to the rationale).

## C. *Plaintiffs' Overbreadth Claim*

■ Plaintiffs contend that the CDA's reliance on local community standards to define online obscenity renders it overbroad. The variance in local community standards, combined with the technological impossibility of controlling the geographic distribution of online materials, may cause the CDA to restrict some protected speech, so that it potentially forces speakers to completely refrain from distributing their materials on the Internet. As discussed above, the Supreme Court's obscenity precedent does not preclude a challenge based on such a theory, as the holdings of *Hamling* and *Sable* do not extend to federal Internet obscenity statutes that might have a substantial inhibiting effect. In addition, *Ashcroft v. ACLU*, the only Supreme Court case to address the potential overbreadth of an Internet obscenity statute, explicitly leaves open the possibility of future overbreadth challenges based on the use of the community standards test. Because the plaintiffs' theory is not foreclosed by precedent, and the overbreadth determination is a factual inquiry, plaintiffs must have the opportunity to establish the facts necessary to show that the CDA is substantially overbroad.

In *Ashcroft*, three Justices formed a plurality that would have held that the community standards test could never render an Internet statute overbroad, because the other prongs of the *Miller* test would limit the statute's sweep, and because Internet content providers bore the burden of complying with the statute. *Ashcroft*, 122 S.Ct. at 1708–14 (Thomas, J., joined by Rehnquist, C.J., and Scalia, J.). Because no one opinion carried a majority of the Justices, however, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (Stewart, J., concurring)). Eight Justices agreed on the narrow proposition that plaintiffs had failed to demonstrate that "COPA's reliance on community standards to identify 'material that is harmful to minors' does not *by itself* render the statute substantially overbroad for purposes of the First Amendment."[6] *Ashcroft*, 122 S.Ct. at 1713 (emphasis in original).

■ This holding does not preclude overbreadth challenges to other federal Internet obscenity statutes based on their use of the community standards test. As Justice Kennedy noted in his concurrence, whether a statute is substantially overbroad must be "judged in relation to the statute's plainly legitimate sweep." *Id.* at 1720 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Thus, the overbreadth inqui-

---

**6.** Indeed, on remand the Third Circuit has once again struck down COPA, in part because its use of the community standards test, when combined with other aspects of the statute, renders it substantially overbroad. *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 266–67 (3d Cir.2003) (recognizing the narrowness of the Supreme Court's *Ashcroft* holding).

ry is necessarily fact-specific, and while COPA's reliance on community standards was not sufficient to render it unconstitutional, another statute could be overbroad because of the variance in local standards. As Justice O'Connor noted, "in future facial challenges to regulation of obscenity on the Internet, litigants may make a more convincing case for substantial overbreadth. Where adult speech is concerned, for instance, there may in fact be a greater degree of disagreement about what is patently offensive or appeals to the prurient interest." *Id.* at 1714. Overbreadth must be proved with reference to the issues raised by, and the practical application of, each individual statute, *see also id.* at 1720–21 (Kennedy, J., concurring), and so the Court's decision with respect to COPA does not foreclose an overbreadth challenge to the CDA. Thus, plaintiffs may be able to establish that the CDA is unconstitutionally overbroad.

### 1. The Substantial Overbreadth Standard

█ In order to establish that the CDA is unconstitutional, plaintiffs must prove that it is substantially overbroad. *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The substantiality of the overbreadth is determined examining the amount of protected speech affected in relation to the amount of unprotected speech legitimately regulated by the statute. *Id.* As three Justices noted in *Ashcroft*, overbreadth "cannot be evaluated in a vacuum. In order to discern whether the variation [in community standards] creates substantial overbreadth, it is necessary to know what speech [the statute] regulates and what

community standards it invokes." *Ashcroft*, 122 S.Ct. at 1721 (Kennedy, J., concurring, joined by Souter and Ginsburg, JJ.). Thus, plaintiffs must present evidence as to the breadth of the statute's coverage as a whole, as well as the amount of protected speech that it may sweep in.[7]

### 2. Establishing the Overbreadth of the CDA

As an initial matter, plaintiffs will need to present evidence as to the total amount of speech that is implicated by the CDA. The broader the CDA, the more protected speech it is likely to cover, and thus the more likely it is to be overbroad. *Id.* at 1709 (plurality opinion) ("The tremendous breadth of the CDA magnified the impact caused by differences in community standards across the country ...."). The fact that the CDA does not limit its coverage to "commercial speech or commercial entities" is relevant here, 47 U.S.C. § 223(a)(1)(B), since the statute consequently reaches the websites of individuals and nonprofit organizations. *See Reno*, 521 U.S. at 877, 117 S.Ct. 2329.

█ Plaintiffs will then have to present evidence as to the amount of protected speech—lacking in serious value, but potentially not patently offensive or appealing to the prurient interest in all communities—that is inhibited by the statute, an endeavor that will involve developing evidence on several different issues. First, plaintiffs must demonstrate how much material is potentially not protected by the serious societal value prong, as this will in turn determine the amount of material that would be affected by varying commu-

7. The Government argues that "plaintiffs here do not come close to making ... a case [that the CDA is overbroad]." (Defs. Reply at 19.) Plaintiffs have not yet had the opportunity for discovery, however, so there is no reason that they should have already compiled enough

evidence to establish that the CDA is overbroad. On this motion to dismiss, the question is not whether plaintiffs have already made their case, but whether it is "beyond doubt" that plaintiffs *cannot* make the case. *Thomas*, 143 F.3d at 36.

nity standards. Since this part of the *Miller* test requires that material have *serious* value before it is considered protected speech, it is possible that it does not provide much protection for those content providers whose materials portray nonmainstream sexual practices. In other words, because the determination as to whether something has "serious" value is an inherently subjective one, there may be a large amount of material, such as Nitke's, that some juries and judges may be less likely to find has serious value, because of the unfamiliarity of the subject matter involved. Whether this is true is an empirical question, the answer to which cannot be known without a factual record.

Second, because the obscenity of material without serious value will be dependent on the community standards of the locations in which the trials occur, plaintiffs should examine community standards in various localities and the extent to which they differ with respect to the material at issue. It is possible, as Justice O'Connor noted in *Ashcroft*, that there is a greater variation in community standards with respect to the offensiveness of sexual material that is directed to adults than as to material that is obscene as to minors. *Ashcroft*, 122 S.Ct. at 1714. On the other hand, it is also possible that the difference in community standards is no greater than the inevitable variation in different juries' applications of a national standard. *Id.* at 1709 (plurality opinion); *id.* at 1716 (Breyer, J., concurring). Thus, plaintiffs must establish that the variation in community standards is substantial enough that the potential for inconsistent determinations of obscenity is greater than that faced by purveyors of traditional pornography, who can control the dissemination of their materials.

Third, plaintiffs must present evidence that this variation in community standards will actually cause speakers to suppress their speech, because of the technological impossibility of reliably limiting the geographic distribution of their materials. Given the speed at which the Internet and its related technologies develop, methods that were technologically impossible in 1999, when the *Ashcroft* district court found that content providers could not prevent online materials from entering particular communities, *id.* at 1708 n. 6 (citing 31 F.Supp.2d 473, 484 (E.D.Pa.1999)), may be possible today. If limiting the distribution of online materials remains impossible or prohibitively expensive, however, the burden on speech imposed by the CDA may be causing self-censorship. *See Reno*, 521 U.S. at 856, 117 S.Ct. 2329.

Finally, plaintiffs should present evidence tending to show that the CDA's two affirmative defenses do not sufficiently limit the amount of protected speech covered by the statute, or plaintiffs' exposure to multiple prosecutions under different standards. These defenses, available to those who have implemented good faith, effective measures to restrict access by minors, 47 U.S.C. § 223(e)(5)(A), and to those who use credit card verification, *id.* § 223(e)(5)(B), may or may not offer practical protection for providers like the plaintiffs. It is possible that, because these are defenses to ultimate liability, rather than shields from prosecution, they do not mitigate the CDA's potential chilling effect at all. *See Shea v. Reno*, 930 F.Supp. at 944 ("[I]t cannot be said that the [CDA's defenses] eliminate any chilling effect that the [indecency] provision otherwise would have."). In addition, since the CDA covers individuals and nonprofit organizations as well as commercial providers, the defenses may require non-commercial providers to take measures that are not economically feasible for them. Faced with prohibitive expenses, online speakers might simply refrain from speaking, rather than attempting to take advantage of the defenses. *Id.*

at 942–50 (discussing whether content providers would attempt to invoke the CDA's defenses at all).[8] Finally, web users may be deterred from visiting websites if they have to provide personal information first, which could cause economic harm to website proprietors, or defeat the purpose of informational websites. *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 258–59 (3d Cir.2003). On the other hand, factual exploration may demonstrate that enough speakers can avail themselves of these defenses, and thus shield themselves from prosecution, to substantially reduce the statute's effect on protected speech.

### D. Plaintiffs' Vagueness Claim

Plaintiffs also assert that the CDA is unconstitutionally vague because its use of community standards deprives Internet content providers of the ability to determine in advance whether their materials are obscene. (Pls. Mem. at 23–24.) A statute is vague if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). It is not necessary that a statute define the universe of proscribed conduct with "mathematical certainty," *id.* at 110, 92 S.Ct. 2294, but it must provide sufficient standards so that law enforcement officials do not have overly broad discretion in determining whether conduct is within the statute, and so that individuals will know by what standards their conduct will be judged, *id.* at 109, 92 S.Ct. 2294. Because plaintiff's vagueness challenge is foreclosed by Supreme Court precedent, the government's motion will be granted with respect to this claim.

In *Miller*, the Supreme Court established that the obscenity standard as a whole is not vague, even though it is impossible for content providers to know with certainty whether their materials are obscene until they have been prosecuted and convicted. The Court conceded that the test fails to "define regulated materials with ultimate, god-like precision," *Miller*, 413 U.S. at 28, 93 S.Ct. 2607, but held that "that lack of precision is not itself offensive to the requirements of due process … all that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices," *id.* at 27–28 n. 10, 93 S.Ct. 2607 (internal quotation marks and citations omitted). Thus, the statutes prohibiting obscenity are not materially different from other statutes that use standards to judge conduct, since the standard cannot be applied to the conduct with any certainty until after it has occurred. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (holding that "imprecise but comprehensible" standards are not vague).

8. In *Reno*, decided in 1997, the Supreme Court discounted the protection provided by both of the CDA's defenses, holding that, insofar as the CDA's indecency provision applied to protected speech, the defenses did not "constitute the sort of 'narrow tailoring' that will save an otherwise patently invalid unconstitutional provision." *Reno*, 521 U.S. at 882, 117 S.Ct. 2329. The Court labeled the § 223(e)(5)(A) defense "illusory" because of its requirement that the measures be effective, stating that the defense did not make allowances for the lack of currently available technology that would be effective. *Id.* at 881, 117 S.Ct. 2329. The credit card verification defense of § 223(e)(5)(B) also failed to narrow the indecency provision, because "it is not economically feasible for most noncommercial speakers to employ such verification." *Id.* Plaintiffs should examine whether these observations remain true five years later, and should present evidence as to whether the defenses more effectively narrow the CDA's obscenity provision than its indecency provision.

The fact that the CDA applies the community standard to the Internet does not render it vague. The characteristics of the Internet do not affect content providers' ability to determine the standards on which their materials will be judged, so for the purposes of a vagueness challenge, Internet obscenity statutes are no different from traditional federal obscenity statutes that incorporate various community standards by reference. Internet content providers, like their predecessors who trafficked in traditional pornography, know that they can be subject to prosecution in any jurisdiction to which they send their materials, and that the standard used will be that of the locality of the prosecution.[9] *See Shea*, 930 F.Supp. at 937 (rejecting plaintiffs' argument that CDA was vague because individual and nonprofit Internet content providers were less financially able to investigate varying community standards than their commercial counterparts). This is all that is required for the CDA to withstand a vagueness challenge. The fact that Internet content providers cannot control the distribution of their materials on the Internet, while central to plaintiffs' overbreadth theory, does not affect content providers' ability to anticipate the standards that will be used, and thus is not relevant to the CDA's alleged vagueness. *See id.* at 938.

■ Plaintiffs next argue that if this Court "deems the CDA to mean something other than the 'most restrictive' standard, ... the failure to explain what such a standard is fails to provide meaningful notice as to what conduct is forbidden by the statute." (Pls. Mem. at 23–24.) In other words, if the Court eventually holds that the CDA cannot apply varying local standards to the Internet, in effect regulating the Internet according to the most restrictive local standard, content providers will not then be able to determine the meaning of the "community standard" used by the CDA. While couched in terms of vagueness, this argument actually pertains to plaintiffs' overbreadth claim.

There is no dispute that, as currently written and construed, the CDA incorporates the *Miller* obscenity test and all of the cases interpreting that test, and that therefore the "community standard" used by the CDA has the same meaning as the community standard referenced in other federal and state obscenity statutes. (Compl. ¶ 27 (citing legislative history); Defs. Mem. at 13.) Indeed, the Supreme Court has assumed as much, stating that local standards may vary, so that the CDA's use of the community standards test will potentially expose content providers to prosecution in any jurisdiction in which the material is viewed. *Reno*, 521 U.S. at 873–74 & n. 39, 117 S.Ct. 2329; *see also Ashcroft*, 122 S.Ct. at 1708–09 (plurality opinion) (applying same reasoning to community standards test in COPA). If the Court were to determine that the community standards test rendered the CDA overbroad, it would then have to attempt to redefine "contemporary community standards" so that the statute would be narrower, in order to avoid declaring it facially unconstitutional and striking it in its entirety. *Brockett v. Spokane Arcades*, 472 U.S. 491, 504, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). Plaintiffs appear to assume, however, that this Court would not, or could not, simply construct a new definition of "community standards" that would restrict less protected speech. (Pls. Mem. at 24.) Thus, the thrust of plaintiffs' argument is that the Court will not be able to narrow the CDA without either completely rewriting it or rendering it vague, so that content providers will not know

---

9. Indeed, plaintiffs assert that they are aware that their materials will be judged by the local standards of whatever jurisdiction prosecutes them. (Pls. Mem. at 23.)

with certainty what "community standards" means. This is an argument that the CDA is not severable, that it must be invalidated in its entirety rather than narrowed. *See American Booksellers Ass'n,* 484 U.S. at 397, 108 S.Ct. 636 (stating that statutes may be narrowed only if they are "readily susceptible" to a narrowing construction); *cf. Reno,* 521 U.S. at 883–85, 117 S.Ct. 2329 (refusing to perform "textual surgery" on statute because of lack of congressional indication as to how terms could be redefined). Since this does not form an independent basis on which to conclude that the CDA may be unconstitutionally vague, the plaintiffs' vagueness challenge must be dismissed.

### IV. *Plaintiffs' Motion for a Preliminary Injunction*

 "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (emphasis in original) (quoting from 11A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2948 (2d ed.1995)). To establish their entitlement to a preliminary injunction, plaintiffs must show that the injunction is necessary to prevent irreparable harm. *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996). In addition, since plaintiffs seek an injunction to "stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted only if plaintiffs show a likelihood of success on the merits. *Beal v. Stern,* 184 F.3d 117, 122 (2d Cir.1999) (internal citations omitted). On the assumption that Nitke and the Foundation will replead with sufficient allegations to establish their standing to bring this suit, the Court will consider the preliminary injunction motion with respect to all three

plaintiffs. Because we find that plaintiffs have not established that they will suffer irreparable harm in the absence of a preliminary injunction, it is unnecessary to reach the question of plaintiffs' likelihood of success on the merits.

Plaintiffs argue that they are entitled to a presumption of irreparable harm because they have alleged that the CDA infringes their First Amendment rights. (Pls. Mem. at 3.) There is some dispute in this Circuit about whether an alleged loss of First Amendment rights is presumed to constitute irreparable harm. *See Amandola v. Town of Babylon,* 251 F.3d 339, 343 (2d Cir.2001) ("We must perforce acknowledge that this Court has not spoken with a single voice on the issue of whether irreparable harm may be presumed with respect to complaints alleging the abridgement of First Amendment rights."). Even if plaintiffs have established that their allegations of chilling effect arising from the CDA are not speculative and that therefore they are entitled to a presumption of irreparable harm, *see Pugh v. Goord,* 184 F.Supp.2d 326, 332 n. 3 (S.D.N.Y.2002), their delay in instituting this lawsuit overcomes the presumption, and defeats their claim of irreparable harm.

The CDA became law in 1996, almost six years before plaintiffs instituted this lawsuit. While its indecency provision was immediately subject to constitutional challenge, and was struck down in 1997, *id.* at 861–62, the obscenity provision has been unaffected by the legal battles, and has been in effect continuously since 1996. Nonetheless, plaintiffs did not file suit until 2001, suggesting that they will not be significantly harmed if they do not receive preliminary relief pending the outcome of this suit. *See Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985); *Million Youth March, Inc. v. Safir,* 18 F.Supp.2d 334, 339–40 (S.D.N.Y.1998). They have

not been prosecuted in that interval, and have not alleged that they face an imminent threat of prosecution. Thus, it does not appear that plaintiffs will be prosecuted if the Government is not preliminarily enjoined from enforcing the CDA.

While plaintiffs have proffered evidence that they or their members feel that their speech is currently inhibited by the CDA (Compl.¶ 30), the statute's alleged chilling effect must have existed since the time of its passage, and plaintiffs have not made any allegations to the contrary.[10] Plaintiffs have not conducted themselves as if the alleged chilling effect constituted irreparable harm, since they could have immediately sued to invalidate the CDA, rather than continuing to modify the contents of their websites (Hechtman Dec. ¶ 2), or delaying their construction for years (Nitke Dec. ¶¶ 2–5). *See Blanksteen v. New York Mercantile Exchange,* 879 F.Supp. 363, 367 (S.D.N.Y.1995) ("The plaintiff's delay is probative of a lack of irreparable harm, because it suggests that the plaintiff did not herself view the potential loss of her interest in voting as threatening irreparable harm."). While the Foundation and the Coalition state that they did not have the financial resources to file this suit until 2001, even legitimate reasons for not filing more promptly are probative of the lack of irreparable harm, since the issue is not whether plaintiffs have been diligent, but whether the long period during which plaintiffs were not prosecuted, and were willing to curtail their speech, indicates that plaintiffs do not consider the harm imminent or irreparable enough to outweigh other practical considerations. Thus, plaintiffs have not established their entitlement to a preliminary injunction.

Because plaintiffs have not established that they will suffer irreparable harm if a preliminary injunction is not granted, there is no need to reach the issue of whether plaintiffs have established a likelihood of success.

## CONCLUSION

The Complaint is dismissed with respect to plaintiffs Barbara Nitke and the Foundation, with leave for both to replead within thirty days of this Opinion and Order. The government's motion to dismiss is denied with respect to plaintiffs' overbreadth claim, and granted with respect to their vagueness claim. Plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.

---

**10.** Nitke does allege that her fears of prosecution grew after President Bush was elected and John Ashcroft became Attorney General (Nitke Reply Aff. ¶ 4), but the potential for prosecution under the CDA even during the Clinton Administration allegedly caused her to delay the construction of her website (*id.* ¶¶ 2–3).