Barbara NITKE and the NATIONAL COALITION FOR SEXUAL FREEDOM, Plaintiffs,

v.

Alberto R. GONZALES, Attorney General of the United States of America and the United States of America, Defendants.

No. 01 Civ.11476 RMB.

United States District Court, S.D. New York.

July 25, 2005.

John Wirenius, Leeds Morelli & Brown, P.C., Carle Place, NY, for plaintiffs.

Benjamin H. Torrance, Assistant United States Attorney (David N. Kelley, United States Attorney for the Southern District of New York, Andrew W. Schilling, and Beth Goldman, Assistant United States Attorneys), New York, NY, for defendants, of counsel.

BEFORE: ROBERT D. SACK, Circuit Judge,* RICHARD M. BERMAN and GERARD E. LYNCH, District Judges.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PER CURIAM.

Plaintiffs Barbara Nitke and the National Coalition for Sexual Freedom[1]

---

* Of the United States Court of Appeals for the Second Circuit.

1. In our previous opinion and order, we dismissed the complaints of plaintiffs Nitke and

challenge the constitutionality of the Communications Decency Act of 1996(CDA), enacted as title V of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 133 (amending and codified at scattered sections of 47 U.S.C.). The CDA's obscenity provisions make it a crime, *inter alia*, knowingly to transmit obscenity by means of the Internet to a minor. 47 U.S.C. § 223(a)(1)(B). The plaintiffs seek a) a declaratory judgment that the CDA is unconstitutional because it is substantially overbroad, and b) a permanent injunction against its enforcement. *See* Am. Compl. at 15.

The plaintiffs instituted this action in December 2001. It was referred to us as a three-judge panel pursuant to section 561 of the CDA, 110 Stat. at 142 (codified at 47 U.S.C. § 223 note). On October 27–28, 2004, after our decision on the defendants' motion to dismiss and the plaintiffs' motion for a preliminary injunction, *Nitke v. Ashcroft*, 253 F.Supp.2d 587 (S.D.N.Y.2003) (*Nitke I*), and subsequent repleading and discovery, we held a bench trial on the plaintiffs' remaining claim challenging the CDA's alleged overbreadth. Pursuant to Federal Rule of Civil Procedure 52(a), we set forth our findings of fact and conclusions of law below.

## BACKGROUND

### I. The Parties

Plaintiff Barbara Nitke is an art photographer whose work focuses on sexually explicit subject matter. Nitke Decl. ¶¶ 1, 3. Much of her work features couples engaging in sadomasochistic sexual behavior. *Id.* ¶ 3. Many of her photographs include explicit images of male and female genitalia, oral, anal, and vaginal intercourse, and other sexual acts. Pls.' Ex. 4. Nitke is on the faculty of the School of Visual Arts and is President of the Camera Club of New York. Nitke Decl. ¶ 1. Her work has been displayed in several galleries and is in the permanent collection of at least one museum. *Id.* ¶ 2. Nitke has created and maintains a Website that displays her photographs, which, she asserts, are in furtherance of her artistic goals. *Id.* ¶ 9.

Plaintiff the National Coalition for Sexual Freedom (NCSF) is a not-for-profit organization formed for the purpose of addressing perceived discrimination against individuals and groups who engage in non-mainstream sexual practices, including sadomasochism and polyamory. Wright Rev. Decl. ¶ 2. NCSF members include both organizations and individuals. *Id.* Some of these members maintain Websites that contain sexually explicit content. *Id.* ¶ 3. NCSF provides a forum for members to share concerns about the consequences of putting certain content on their Websites. *Id.* NCSF also gathers and disseminates information about conferences and meetings relating to the issue of sadomasochism, receives requests for assistance regarding media incidents, and has published organization guidelines for members entitled "How to Protect Your Event." *Id.* ¶¶ 8–9.

Defendant Alberto Gonzales is the Attorney General of the United States.[2] In that capacity, he is "head of the Depart-

the National Coalition for Sexual Freedom Foundation (an entity different from plaintiff the National Coalition for Sexual Freedom) for lack of standing, with leave to replead. *Nitke v. Ashcroft*, 253 F.Supp.2d 587, 596–99, 611 (S.D.N.Y.2003). Nitke has repleaded; the Foundation did not and is therefore no longer a plaintiff.

**2.** At the time the plaintiffs commenced this action, John Ashcroft was Attorney General of the United States and was named as a defendant. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Attorney General Gonzales was substituted for former Attorney General Ashcroft as a defendant.

ment of Justice and chief law enforcement officer of the Federal Government." U.S. Dep't of Justice, "Office of the Attorney General," *at* http://www.usdoj.gov/ag/ (last visited June 9, 2005).

## II. The Internet

The Internet is a network of interconnected private and public computers that are linked for communications and data-sharing purposes. *See* 47 U.S.C. § 230(f)(1); *see also Nitke I,* 253 F.Supp.2d at 593–94. Individuals may obtain access to the Internet through computers that are connected to it directly or through an Internet service provider. The World Wide Web is one component of the Internet. The Web is formed from a network of computers called "Web servers" that host pages of content accessible via the Hypertext Transfer Protocol (HTTP). *Nitke v. Ashcroft,* No. 01 Civ. 11476, slip. op. at 23 (S.D.N.Y. Sept. 16, 2004) (joint pre-trial order in the instant litigation). Individuals may view information on the Web using "browser" software, and may publish information to the Web by placing information on a Web server, directly or through a Website host. *Id.* Websites often provide links to other Websites. *Id.* Individuals and other content providers may acquire with relative ease the necessary server space to put up Websites or transmit information in other ways. Many sites allow users to access all Webpages that the site contains; other sites require that the user enter specified information before he or she can gain access to their contents. McCulloch Decl. ¶ 2; *see also Reno v. ACLU,* 521 U.S. 844, 849–53, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (describing the Internet in the course of addressing constitutionality of portion of the CDA); *ACLU v. Reno,* 929 F.Supp. 824, 830–38 (E.D.Pa.1996) (same), *aff'd,* 521 U.S. 844, 849–53, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

## III. The CDA

The CDA prohibits "by means of a telecommunications device knowingly . . . initiat[ing] the transmission of[ ] any comment, request, suggestion, proposal, image, or other communication which is obscene or child pornography, knowing that the recipient of the communication is under 18 years of age, regardless of whether the maker of such communication placed the call or initiated the communication." 47 U.S.C. § 223(a)(1)(B). "Given the size of the potential audience for most messages, in the absence of a viable age verification process, the sender [of any given communication] must be charged with knowing that one or more minors will likely view it." *Reno v. ACLU,* 521 U.S. at 876, 117 S.Ct. 2329. Thus, the CDA prohibits (subject to affirmative defenses discussed below) any transmission of obscenity (or child pornography which is not at issue here) by means of the Internet.

■ As the parties do not dispute, the CDA incorporates the definition of obscenity set forth in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). *See Nitke I,* 253 F.Supp.2d at 594. Under the *Miller* test, a communication is obscene if, first, "the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest;" second, "the work depicts or describes, in a patently offensive way, sexual conduct," when judged by contemporary community standards; and third, "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller,* 413 U.S. at 24, 93 S.Ct. 2607 (citations and internal quotation marks omitted).

The first and second prongs of the *Miller* test are, by their terms, determined in accordance with contemporary community

standards in the relevant locality. *See id.; see also Nitke I*, 253 F.Supp.2d at 600–01. Thus, whether material appeals to the prurient interest and is patently offensive are questions of fact that depend on a particular community's standards. *See Miller*, 413 U.S. at 30, 93 S.Ct. 2607; *see also Nitke I*, 253 F.Supp.2d at 601. As a result, material that is not legally obscene in one locality may be legally obscene in another. *See Miller*, 413 U.S. at 32–33, 93 S.Ct. 2607; *see also Nitke I*, 253 F.Supp.2d at 602. By contrast, the third prong of the *Miller* test—that the work not have serious literary, artistic, political, or scientific value—is based on a national standard for such value that is established as a matter of law. *Reno v. ACLU*, 521 U.S. at 873, 117 S.Ct. 2329; *see also Nitke I*, 253 F.Supp.2d at 600–01.

The CDA provides two affirmative defenses: that the defendant "has taken, in good faith, reasonable, effective, and appropriate actions under the circumstances to restrict or prevent access by minors to a[n obscene] communication" or "has restricted access to such communication by requiring use of a verified credit card, debit account, adult access code, or adult personal identification number." 47 U.S.C. § 223(e)(5).

## DISCUSSION

As a foundation for our findings of fact and conclusions of law, we rehearse here the basic legal principles applicable to resolving this pre-enforcement challenge to the CDA.

### I. Standing to Challenge the CDA

The Government argues that the plaintiffs do not have standing to challenge the CDA. Defs.' Post–Trial Proposed Findings Fact & Conclusions Law (Defs.' PTPF) ¶ 50. Under Article III of the United States Constitution, the jurisdiction of the federal courts is limited to "adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The doctrine of standing grew out of this fundamental rule. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.* at 750–51, 104 S.Ct. 3315 (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). To meet the constitutional requirements for standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* at 751, 104 S.Ct. 3315.

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

The injury required for standing to pursue a First Amendment challenge may take the form of "constitutional violations ... aris[ing] from the deterrent, or 'chilling,' effect of government regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *accord Meese v. Keene*, 481 U.S. 465, 472, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). For such injury to meet the requirement that it be "distinct and palpable," *Allen*, 468 U.S. at 751, 104 S.Ct. 3315, the plaintiff must have suffered more than a "subjective 'chill,'" *Laird*, 408

U.S. at 13–14, 92 S.Ct. 2318; *see also Nitke I*, 253 F.Supp.2d at 596. The plaintiff must show that she is subject to a "specific present objective harm or a threat of specific future harm." *Laird*, 408 U.S. at 13–14, 92 S.Ct. 2318; *see also Nitke I*, 253 F.Supp.2d at 596. In a pre-enforcement challenge such as the one before us, the plaintiff may do so by establishing that she has "an actual and well-founded fear that the law will be enforced against" her. *Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 382 (2d Cir.2000) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)).

To show that a fear is "actual," "a plaintiff must proffer some objective evidence to substantiate his claim that the challenged conduct has deterred him from engaging in protected activity." *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir.1991); *see also Nitke I*, 253 F.Supp.2d at 596. And to show that a fear is "well-founded," the plaintiff must show that it is reasonable. *Vt. Right to Life*, 221 F.3d at 383. A fear that a statute will be enforced against a plaintiff is reasonable if the plaintiff's interpretation of the statute to reach his or her conduct is itself reasonable. *See Am. Booksellers Ass'n*, 484 U.S. at 392, 108 S.Ct. 636 (concluding that plaintiffs had standing to bring pre-enforcement First Amendment challenge where they would suffer injury "if their interpretation of the statute is correct"). Mere assurances by the government that it does not seek to enforce the statute do not *ipso facto* make such a fear unreasonable, because "there is nothing that prevents the [government] from changing its mind" and the resulting uncertainty is sufficient to establish the reasonableness of a fear. *Vt. Right to Life*, 221 F.3d at 383.

■ In addition to showing that they have suffered injury in fact, plaintiffs must also show that the injury is "fairly traceable" to the conduct complained of, and "likely to be redressed" by the relief sought. *Allen*, 468 U.S. at 750, 104 S.Ct. 3315; *see also Nitke I*, 253 F.Supp.2d at 596. The "fairly traceable" requirement is satisfied if there is a "causal connection between the assertedly unlawful conduct and the alleged injury." *Allen*, 468 U.S. at 753 n. 19, 104 S.Ct. 3315. And the "redressability" requirement is satisfied if there is a "causal connection between the alleged injury and the judicial relief requested." *Id.*

■ The doctrine of associational standing provides a limited exception to the requirement that a plaintiff "must assert his own legal rights and interests." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 715 (2d Cir.2004). Under this doctrine, "an association [may have] standing to maintain a suit to redress its members' injuries, rather than an injury to itself" if it can meet a three-prong test. *Id.* at 713. "Under this test, the association has standing if '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)); *see also Nitke I*, 253 F.Supp.2d at 597.

## II. Overbreadth

■ The plaintiffs assert that the CDA is substantially overbroad in violation of the First Amendment because it reaches both obscene and non-obscene speech. Am. Compl. ¶¶ 43–46. Obscene speech is not protected under the First Amendment. *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 124, 109 S.Ct. 2829, 106

L.Ed.2d 93 (1989). In *Miller,* 413 U.S. at 24, 93 S.Ct. 2607, the Supreme Court established the three-part test for obscenity set forth above. Speech that is not obscene under the *Miller* test is entitled to First Amendment protection even if it is sexually explicit or "indecent."[3] *Id.* at 26–28, 93 S.Ct. 2607; *see also Reno v. ACLU,* 521 U.S. at 874–75, 117 S.Ct. 2329. Congress may regulate obscene speech so long as such regulation is rational. *See Miller,* 413 U.S. at 19–20, 93 S.Ct. 2607.

■■■■ A statute is overbroad if it prohibits speech that is protected by the First Amendment. *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Although minor overinclusiveness is not enough to render a statute unconstitutional, *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 60, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989), if the statute prohibits a substantial amount of speech relative to its legal breadth, then it is facially invalid, *Virginia v. Hicks,* 539 U.S. 113, 123–24, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003); *accord McConnell v. Fed. Election Comm'n,* 540 U.S. 93, 207, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). "In such cases, it has been the judgment of [the Supreme Court] that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes." *Broadrick,* 413 U.S. at 612, 93 S.Ct. 2908. The

substantiality of such overbreadth is determined by comparing the amount of protected speech that is prohibited by the statute to its "plainly legitimate sweep." *Id.* at 615, 93 S.Ct. 2908; *accord Fort Wayne Books,* 489 U.S. at 60, 109 S.Ct. 916; *see also Nitke I,* 253 F.Supp.2d at 605.

The plaintiffs assert that by applying the local standards of the *Miller* test to the Internet, the CDA sweeps within its prohibitions a substantial amount of protected speech. Under the *Miller* test, speech that is legally obscene and therefore without constitutional protection in one community may enjoy full protection in another. *Miller,* 413 U.S. at 32–33, 93 S.Ct. 2607; *see also Nitke I,* 253 F.Supp.2d at 603. The plaintiffs assert that they cannot control the locations to which their Internet publications are transmitted, and therefore any material that they publish to the Internet may be prohibited under the CDA because it may be legally obscene in one or more communities even if not legally obscene in others. Thus, they argue that the CDA is overbroad inasmuch as it prohibits, based on the standards prevailing in one or more communities, a substantial amount of speech that is protected, based on standards prevailing in at one or more other communities.

In our earlier Opinion and Order, we denied the government's motion to dismiss the complaint with respect to the plaintiffs' overbreadth challenge. *Nitke I,* 253 F.Supp.2d at 606.[4] In so doing, we con-

---

3. This assumes, of course, that the speech does not fall outside the First Amendment for unrelated reasons. *See, e.g., Virginia v. Black,* 538 U.S. 343, 358–59, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (discussing the "few limited areas, [such as fighting words, that] are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality," and where the speech is

therefore not constitutionally protected (internal quotation marks omitted)).

4. In *Nitke I,* we also granted the government's motion to dismiss the complaint with respect to the plaintiffs' claim that the CDA was unconstitutionally vague as a result of its incorporation of the *Miller* standard, concluding that that claim was foreclosed by the Supreme Court's decision that the *Miller* stan-

cluded that the Supreme Court's opinion in *Ashcroft v. ACLU*, 535 U.S. 564, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002), did not preclude the plaintiffs' challenge to the CDA's obscenity provisions on overbreadth grounds. *Nitke I*, 253 F.Supp.2d at 605–06. We explained that while "three Justices [in *Ashcroft v. ACLU* ] formed a plurality that would have held that the community standards test could never render an Internet statute overbroad," "no one opinion carried a majority of the Justices" and we would therefore hew to the " 'position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Id.* at 605 (quoting *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)). We concluded that *Ashcroft v. ACLU* "does not preclude overbreadth challenges to other federal Internet obscenity statutes based on their use of the community standards test." *Id.*

As we explained in *Nitke I*, whether the CDA is overbroad is an empirical question. *Nitke I*, 253 F.Supp.2d at 607. In this declaratory and injunctive action, the plaintiffs bear the burden of establishing that the CDA is overbroad and the substantiality of such overbreadth. In *Nitke I*, we detailed what the plaintiffs would be required to establish to prevail on this claim. *Id.* at 606–08. First, we said that the plaintiffs would "need to present evidence as to the total amount of speech that is implicated by the CDA." *Id.* at 606. Second, we said that the plaintiffs must "present evidence as to the amount of protected speech—lacking in serious value [and therefore not categorically protected], but potentially not patently offensive or appealing to the prurient interest in all communities [and therefore possibly lawful in some communities while unlawful in others]." *Id.* In presenting evidence on this second point, we stated that the plaintiffs were required to 1) "demonstrate how much material is potentially not protected by the serious societal value prong," *id.*; 2) "examine community standards in various localities and the extent to which they differ with respect to the material at issue," *id.* at 607, in order to "establish that the variation in community standards is substantial enough that the potential for inconsistent determinations of obscenity is greater than that faced by purveyors of traditional pornography, who can control the dissemination of their materials," *id.*; 3) "present evidence that this variation in community standards will actually cause speakers to suppress their speech, because of the technological impossibility of reliably limiting the geographic distribution of their materials," *id.*; and 4) "present evidence tending to show that the CDA's two affirmative defenses do not sufficiently limit the amount of protected speech covered by the statute, or plaintiffs' exposure to multiple prosecutions under different standards," *id.* As to the latter, the plaintiffs assert that it is technologically impossible for publishers to take "effective . . . actions . . . to restrict or prevent access," 47 U.S.C. § 223(e)(5)(A), to their Webpages and that the cost and privacy concerns associated with credit card verification may be prohibitive. Am. Compl. ¶¶ 37–38; Nitke Decl. ¶¶ 20–21.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

During the two-day bench trial of this case, pursuant to the Joint Pre–Trial Order, the witnesses called by the parties

---

dard was not unconstitutionally vague. *Nitke I*, 253 F.Supp.2d at 608 (citing *Miller*, 413 U.S. at 27–28, 93 S.Ct. 2607).

gave their direct testimony by declaration. These declarations were marked as exhibits at trial and the court heard cross-examination of the witnesses. Our findings of fact and conclusions of law based on that trial are as follows.

## I. Findings of Fact

1. Images posted on the Internet may generally be viewed by Internet users in any community in the United States, although owners of Websites may employ software in an attempt to restrict access to their sites. *Compare* Laurie Decl. *passim* (stating that such technology is ineffective), Finkelstein Decl. ¶¶ 8, 13–18 (same), Tr. at 60, 63 (Hechtman testimony) (discussing use of credit cards to verify age and stating that it is ineffective), *with* Miltonberger Decl. ¶ 2 (stating that current technology is effective), McCulloch Decl. ¶ 2 (same).

2. Works that are considered offensive in a community may engender an obscenity prosecution in that community, irrespective of whether it will ultimately be judicially determined that those works have serious artistic or social value. Danto Decl. ¶¶ 10–12; Nitke Decl. ¶ 12; Tr. at 73–74 (Steinberg testimony).

3. The determination of whether certain works have serious artistic or social value turns on the subjective judgment of the trier of fact, and the difficulty of assessing whether a work will be deemed to have serious artistic or social value increases when the work deals with sexually explicit subject matter. Danto Decl. ¶¶ 10–11, 15; Tr. at 93–94 (Danto testimony).

4. Nitke refrained from publishing on her Website certain sexually explicit images, including depictions of sexual practices that were not "mainstream" or which Nitke thought would be otherwise controversial because of their sexual content, Nitke Decl. ¶ 16; Pls.' Ex. 4, because she was afraid that she might be prosecuted in one or more communities for doing so, Nitke Decl. ¶ 16.

5. Because of the sexual content of Nitke's images, she faces a material risk that her works will be considered "patently offensive" and "appeal[ing] to the prurient interest" in one or more communities and that she will be prosecuted for obscenity. Tr. at 288–90 (Douglas testimony) (stating that images depicting non-mainstream sexual acts are more likely to be prosecuted); Douglas Decl. ¶ 5(b).

6. Although Nitke's work is regarded by many as having serious artistic value, Nitke Decl. ¶¶ 17–18 (stating that works were created in line with artistic aims); Danto Decl. ¶ 12, and the government concedes here that Nitke's photographs have such value, Defs.' PTPF ¶ 51; Tr. at 293, there is a reasonable likelihood that other federal prosecutors will not agree that her work has such value and will prosecute her under the CDA.

7. There is also a reasonable likelihood that some triers of fact, applying a national standard for artistic value, would not agree that Nitke's work has serious artistic value.

8. The Eulenspiegel Society (TES) is a member organization of plaintiff NCSF. Hechtman Decl. ¶ 1.

9. TES chose not to post sexually explicit materials, including the contents of its magazine *Prometheus*, on its Website in order to avoid a possible prosecution for obscenity in one or more communities. Hechtman Decl. ¶¶ 5–6; Pls.' Ex. 12.

10. Because of the sexual content of these materials, TES faces a substantial likelihood that the materials would be considered "patently offensive" and "appeal[ing] to the prurient interest" in some

communities. *See* Tr. at 288–90 (Douglas testimony); Douglas Decl. ¶ 5(b).

11. Although the materials that TES refrained from posting on its Website are regarded as having serious artistic and social value by some, *see* Hechtman Decl. ¶ 8, there is a reasonable likelihood that some triers of fact would find that these materials lacked serious artistic or social value.

12. NCSF provides a forum for members of the organization to share concerns about the consequences of placing certain content on their Websites and aims to fight what it considers to be discrimination against and provide support for individuals and groups who engage in non-mainstream sexual practices.

13. The plaintiffs have offered insufficient evidence to enable us to make a finding as to "the total amount of speech that is implicated by the CDA," *Nitke I*, 253 F.Supp.2d at 606. Indeed, the plaintiffs concede that they cannot "compute the number of potentially affected Websites and other speakers with anything like accuracy." Pls.' Post–Trial Proposed Findings Fact & Conclusions Law (Pls.' PTPF) ¶ 48.

14. The plaintiffs have offered evidence that there are at least 1.4 million Websites that mention "BDSM" (bondage, discipline, and sadomasochism). Moser Decl. ¶ 12. The plaintiffs have offered insufficient evidence to enable us to make a finding, however, as to how many of those sites might be considered obscene, let alone how many would be considered obscene in at least one community while considered not obscene in others.

15. The plaintiffs have submitted images and written works that represent material, posted to a small number of Websites, that they contend may be considered obscene in some communities but not in others. These examples provide us with an insufficient basis upon which to make a finding as to the total amount of speech that is protected in some communities but that is prohibited by the CDA because it is obscene in other communities.

16. While the plaintiffs have offered evidence that, for a small sample of communities, obscenity standards differ from community to community, *see* Douglas Decl. ¶¶ 2(A), 5(A)-(B); Nitke Decl. ¶¶ 12, 14; Danto Decl. ¶ 9; Wright Decl. ¶¶ 6–7, they have not offered sufficient evidence to enable us to determine, for the United States as a whole, the extent to which standards vary from community to community or the degree to which these standards vary with respect to the types of works in question. Indeed, the plaintiffs' expert witness testified that he was unable to determine the standards for obscenity in any given region. Douglas Decl. ¶ 5(D); *see also* Tr. at 264 (Douglas testimony) (affirming that he "saw no pattern in terms of what was prosecuted nationwide"); *id.* at 267 (Douglas testimony) (agreeing that "community standards within American communities are not reasonably determinable" and that Douglas has "never conducted a poll or survey to determine community standards in various communities"); Pls.' PTPF ¶ 50.

17. There is insufficient evidence offered by the plaintiffs to enable us to make a finding as to how much of the material that might be found to be patently offensive and appealing to the prurient interest in at least one community, and that would not be found to be so offensive or appealing in others, would also be found not to have serious artistic or social value.

18. There is insufficient evidence in the record to enable us to make a finding as to whether "the variation in community standards is substantial enough that the potential for inconsistent determinations

of obscenity is greater than that faced by purveyors of traditional pornography, who can control the dissemination of their materials." *Nitke I,* 253 F.Supp.2d at 607.

## II. Conclusions of Law

1. Nitke's fear that the CDA will be enforced against her is "actual and well-founded." *Vt. Right to Life,* 221 F.3d at 382. She has submitted objective evidence to substantiate the claim that she has been deterred from exercising her free-speech rights, and this fear is based on a reasonable interpretation of the CDA. *See Am. Booksellers Ass'n,* 484 U.S. at 392, 108 S.Ct. 636; *Vt. Right to Life,* 221 F.3d at 383.

2. The injury in fact that Nitke suffered is fairly traceable to enforcement of the CDA and would likely be redressed by the relief sought. *See Allen,* 468 U.S. at 750, 104 S.Ct. 3315.

3. Nitke therefore has standing to bring this pre-enforcement challenge to the CDA. *See id.* at 750–51, 104 S.Ct. 3315.

4. NCSF has submitted objective evidence that one of its member organizations, TES, has been deterred from exercising its free-speech rights and that this deterrence is based on a well-founded fear that the CDA would be enforced against it. *See Bordell,* 922 F.2d at 1061; *Vt. Right to Life,* 221 F.3d at 383.

5. The injury in fact that TES suffered is fairly traceable to enforcement of the CDA and would likely be redressed by the relief sought. *See Allen,* 468 U.S. at 750, 104 S.Ct. 3315.

6. TES thus would have standing to challenge the enforcement of the CDA in its own right. *See id.* at 750–51, 104 S.Ct. 3315.

7. The interests that NCSF seeks to protect—the ability of those practicing non-mainstream sexual activities to exercise their free-speech rights—are relevant to its purposes of fighting perceived discrimination against non-mainstream sexual practices and providing a forum for discussion related to that topic.

8. Neither the overbreadth claim asserted nor the injunctive relief requested requires the participation of TES as a plaintiff, because the claim is addressed to the breadth of the CDA with respect to all speech it reaches and the relief sought applies equally to all affected persons and organizations.

9. NCSF has therefore established that it has standing to challenge the constitutionality of the CDA on behalf of its members. *See Bano,* 361 F.3d at 715.

10. Because the plaintiffs presented insufficient evidence to support findings regarding "the total amount of speech that is implicated by the CDA," "the amount of protected speech—lacking in serious value, but potentially not patently offensive or appealing to the prurient interest in all communities—that is inhibited by the [CDA]," or whether "the variation in community standards is substantial enough that the potential for inconsistent determinations of obscenity is greater than that faced by purveyors of traditional pornography, who can control the dissemination of their materials," *Nitke I,* 253 F.Supp.2d at 606–07, they have not established their claim that the overbreadth of the CDA, if any, is substantial and that the CDA therefore violates the First Amendment, *id.*

11. Because we decide the case on the basis of the failure of the plaintiffs to establish substantial overbreadth, we need not and do not reach the issues of whether some of the works that plaintiffs present as examples of chilled speech would be protected by the social value prong of the

*Miller* test, whether current technology would enable plaintiffs to control the locations to which their Internet publications are transmitted, or whether the CDA's two affirmative defenses provide an adequate shield from liability.

## CONCLUSION

For the foregoing reasons, we conclude that the plaintiffs have not met their burden of proof with respect to the only claim remaining in this action, their overbreadth challenge to the CDA. The Clerk of Court shall enter judgment for the defendants.

SO ORDERED.